**Leroy W. ABELL et al.**

v.

**The UNITED STATES.**

**Jack R. BARGER et al.**

v.

**The UNITED STATES.**

Nos. 261–72, 371–73.

United States Court of Claims.

June 25, 1975.

David Minton, Washington, D. C., for plaintiff; Robert A. Saltzstein, Washington, D. C., atty. of record. Wyatt, Saltzstein, Minton and Howard, Washington, D. C., Paul G. Olsen, Jones, Olsen & Christensen, Billings, Mont., and Arnold Olsen, of counsel.

Francis H. Clabaugh, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant; Lawrence Cox, Portland, Or., of counsel.

Before DAVIS, SKELTON and KASHIWA, Judges.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge.

Plaintiffs, wage board employees of the Bonneville Power Administration of the Department of the Interior (hereinafter Bonneville), claim in this suit that they are being denied 25 per cent Sunday premium pay required by Section 405(f) of the Federal Employees Salary Act of 1966 (5 U.S.C. § 5544(a)) and alternatively that if they are not entitled to 25 per cent Sunday premium pay under this act, they are nonetheless entitled to it because "the prevailing rates in the industry provide for premium pay for Sunday work" and Bonneville is required to fix compensation for plaintiffs in accordance with the prevailing rates in the public electrical utilities industry in the Pacific Northwest.

This is a consolidation of the cases of *Barger et al. v. United States,* Ct.Cl. No. 371–73, and *Abell et al. v. United States,* Ct.Cl. No. 261–72. There is no genuine issue as to any material fact. Essential facts have been stipulated. Parties have filed cross motions for summary judgment. We hold for the defendant in both cases, allowing defendant's motion for summary judgment and denying plaintiffs' motion for summary judgment.

The stipulated facts are as follows. Bonneville was started and established under the Act of August 20, 1937 (50 Stat. 731, as amended, 16 U.S.C. §§ 832–832*l* (1970)), within the Department of the Interior. It is required and charged by statute, Executive order, and orders of the Secretary of the Interior with responsibility for marketing electric power generated from Federal hydroelectric projects in the Pacific Northwest (Bonneville Project Act, Act of August 20, 1937, 50 Stat. 731, as amended, 16 U.S.C. §§ 832–832*l* (1970); § 2 River and Harbor Act of 1945, Act of March 2, 1945, 59 Stat. 10, 22; § 5 Flood Control Act of 1944, Act of December 22, 1944, 58 Stat. 887, 890; Executive Order No. 8526, 5 Fed.Reg. 3390 (1940); Secretarial Order No. 2860, as amended, 27 Fed.Reg. 591 (1962), 28 Fed.Reg. 5273 (1963), 31 Fed.Reg. 13560 (1966)). To fulfill these responsibilities, Bonneville, has constructed, operates and maintains a major electrical transmission system which exceeds 12,000 miles. It has also constructed appropriate load dispatching centers and substations throughout the states of Oregon, Washington, Idaho and Montana, the geographic area of its system. The transmission lines and related electric facilities represent an investment of more than $1.2 billion. Investment in electrical generation facilities for which Bonneville has the repayment obligation is an additional $1.9 billion. Total system revenues for 1973 exceeded $177.4 million.

Bonneville employs about 3,828 employees, 1,400 of whom are hourly employees whose compensation is fixed through collective bargaining, to operate and maintain this vast system which includes more than 200 load dispatching centers or substations, 50 of which are manned by dispatchers, operators and relief operators seven days a week throughout the year. Over one-half of these are manned continuously, 24 hours a day. These dispatchers, operators and relief operators are hourly employees whose rates of compensation are fixed through contract negotiation between Bonneville and the Columbia Power Trades Council (hereinafter the union), a council composed of 16 unions including the International Brotherhood of Electrical Workers.

Bonneville's hourly employees are appointed in accordance with the Civil Service laws of the United States and for purposes of retirement, sick leave, annual leave, severance pay, workmen's compensation and other benefits are

treated substantially the same as annual employees. Only in the significant area of compensation do these employees differ markedly. Since 1945 their compensation has been arrived at by collective bargaining and fixed without regard to any other law, rule or regulation of the United States. The initial authority for Bonneville to undertake collective bargaining and to fix the compensation of its hourly employees in this fashion is contained in the 1945 amendments to the Bonneville Project Act (Act of October 23, 1945, 59 Stat. 546, 547), and defendant claims that the authority has remained unchanged.

Between 1937 and 1945 the laborers, mechanics and workmen employed by Bonneville were true wage board employees. They were excluded from coverage of the 1923 Classification Act. Their rates of pay were fixed by administrative action. After 1945, pursuant to the above-referenced amendments, their compensation was fixed through collective bargaining. To develop a base for negotiations Bonneville surveyed utilities within the Pacific Northwest, employing similar crafts. At some time subsequent to 1945, Bonneville and the union representing Bonneville's hourly employees adopted the practice of making a joint survey. Representatives of Bonneville and the union cooperate in preparing this survey. Originally, only six utilities were surveyed; however, when the joint survey was expanded to include the United States Bureau of Reclamation and the Corps of Engineers, the number of utilities was increased to eight. These include the four largest private electric utilities in the Pacific Northwest—Pacific Power & Light Company, Portland General Eelectric Company, Puget Sound Power & Light Company and the Washington Water Power Company; two large public utility districts (hereinafter PUD) which have significant electrical generation—Grant County PUD and Chelan County PUD; and the two largest municipally owned electric utilities—Seattle City Light and Tacoma City Light.

The Bureau of Reclamation uses this survey to negotiate wage rates for employees employed at Grand Coulee, Washington; and the Corps of Engineers submits this survey data to a wage-fixing authority in Washington, D. C., which establishes wage rates for the Northwest.

The current collective bargaining agreement between the union, which is the exclusive representative for the class which includes all plaintiffs, does not provide for Sunday premium pay for Bonneville's hourly employees. Agreements have been negotiated each year since the enactment of Section 405(f) of the Federal Salary and Fringe Benefits Act of 1966 (80 Stat. 288) (now codified as 5 U.S.C. § 5544(a) (1966)), establishing the Sunday premium. The benefit which plaintiffs claim has never been included in any negotiated agreement. It was specifically requested by the union during the 1967 annual contract negotiations between Bonneville and the union and rejected by Bonneville on the ground that the current wage survey indicated it was not a prevailing rate. Since that date the union has not requested this Sunday premium pay in its annual negotiations.

During all of the period of employment set forth in plaintiffs' petition, plaintiffs were paid on the basis of a 40-hour week at hourly rates of pay. None of the plaintiffs received any premium compensation for Sunday work as that term is used in the Federal Salary and Fringe Benefits Act of 1966, enacted July 18, 1966.

The normal schedule of those plaintiffs who work rotating shifts in positions which are manned around the clock, seven days per week, requires that each work approximately 39 Sundays per year from July 18, 1966.

The normal schedule for those plaintiffs who occupy positions at 24-hour call stations requires that each work approximately 26 Sundays per year from July 18, 1966.

Plaintiffs originally filed their petition alleging that Public Law 89–504, 5

U.S.C. § 5544(a) (1966), required payment to them by Bonneville of 25 per cent premium pay for Sunday work. By amendment dated December 6, 1972, plaintiffs further allege that if 5 U.S.C. § 5544(a) is not applicable to them, they are nonetheless entitled to 25 per cent Sunday premium pay "because the prevailing rates in the industry provide for premium pay for Sunday work" and Bonneville is required to fix the compensation for plaintiffs in accordance with the prevailing rates in the electrical utility industry. Defendant's answer, denying plaintiffs' allegations, was filed on August 23, 1972. Plaintiffs' motion for summary judgment was filed March 27, 1974. Defendant's cross motion for summary judgment was filed September 10, 1974.

We shall now turn to the first and primary issue in this case: Whether plaintiffs who are wage board employees of Bonneville, are entitled to 25 per cent premium pay for working on Sunday pursuant to Public Law 89–504, 5 U.S.C. § 5544(a), enacted July 18, 1966.

In order to fully understand the statutory construction problem presented in this case, it is necessary to have a clear picture of the creation of Bonneville in 1937 and of the events which took place thereafter until the passage of the Act of October 23, 1945 (hereinafter the 1945 Act). These facts are well summarized in the defendant's brief and since plaintiffs do not dispute these basic facts, we shall quote from Defendant's Cross Motion for Summary Judgment, at pp. 9a–14 (footnotes and emphasis omitted):

Bonneville's organic legislation, enacted in 1937, orginally provided:

"Sec. 10. The Administrator, the Secretary Of War, and the Federal Power Commission, respectively, shall appoint such attorneys, engineers, and other experts as may be necessary for carrying out the direction [sic: functions] entrusted to them under the [sic: this] Act, without regard to the provisions of the civil service laws and shall fix the compensation of each of such attorneys, engineers and other experts at not to exceed $7,500 per annum; and they may, subject to the civil service laws, appoint such other officers and employees as may be necessary to carry out such functions and fix their salaries in accordance with the Classification Act of 1923, as amended. (59 Stat. 547)" [sic; 50 Stat. 731, 736]

During the initial years of operation, Bonneville experienced problems in recruiting and retaining the skilled and semi-skilled workmen essential for operation of its complex facilities. Bonneville was a utility competing directly with industry and private utilities in the Pacific Northwest for these workmen. It found it could not compete.

Private utilities paid time and one-half for overtime. Bonneville could not. Private utilities paid a minimum of two hours pay when an employee was called back because of an emergency. Bonneville could not. Private industry paid a night differential. Bonneville could not. Private utilities which did not pay a night differential effectively increased pay by allowing eight hours pay for seven and one-half hours' work. Bonneville could not. Private utilities paid for time its employees spent in travel required by system emergencies. Bonneville could not. Bonneville could pay only for time actually worked and time spent in traveling was, and generally still is, not considered work under the rules applicable to Government employees. Private utilities could pay daily overtime and paid time and one-half for all Sunday overtime. Bonneville could not. Under temporary war powers Bonneville met this practice. But this authority was temporary and upon expiration the controlling law was Section 23 of the 1934 Independent Offices Appropriation Act, Act of March 28, 1934, 48 Stat. 509, 522, (then codified as 5 U.S.C. § 673c) (See 20 Comp. Gen. 392 (1940)). Under that statutory provision payment of overtime for

wage board employees was limited to those hours worked in excess of 40 hours per week.

In 1945, to ameliorate many of its problems, Bonneville went to Congress seeking extraordinary authority to enable it to successfully compete within the utility industry in the Pacific Northwest. It was successful in having H.R. 2690 enacted as Public Law No. 201, 79th Cong., 1st Sess. (1945).[1] This legislation was justified in part before the House of Representatives by the then General Counsel for Bonneville. He testified:

"The Bonneville Power Administration is not carrying out a government regulatory program. It is engaged in a large scale business enterprise * *.

"Ordinary Government procedure was not designed for use in a business operation of that nature and magnitude, and it has hampered the Administrator to an unwarranted extent. H.R. 2690 and H.R. 2693 are based on the premise that Bonneville is a regional and business agency, and they will permit it to operate in a more businesslike manner * * *.

"Because of the nature of the business in which the Administrator is engaged, his activities are constantly being compared with those of private utilities and private contractors. With respect to labor practices he suffers by comparison. The Administration operates and maintains electric facilities and occasionally undertakes construction work on force account. He should be able to follow the same, or comparable, labor practices as do private utilities and contractors in the same work. H.R.Rep.No.2690, 79th Cong., 1st Sess. 3 (1945)."

(Similar comments appear in the Senate and House Reports on H.R. 2690 (S.Rep.No.469, 79th Cong., 1st Sess. (1945); H.Rep.No.777, 79th Cong., 1st Sess. (1945)).

Congress recognized the unique status of Bonneville and by the 1945 amendments Bonneville obtained the extraordinary authority required. The Administrator was granted the right to modify, adjust, cancel or compromise contracts or agreements he entered under the Bonneville Act. He could settle, compromise or pay claims against Bonneville arising out of the acts of employees. He could accept voluntary services. And, for the purpose of this action the most significant change, he could:

" * * * [E]mploy laborers, mechanics, and workmen in connection with construction work or the operation and maintenance of electrical facilities (hereinafter called 'laborers, mechanics and workmen') subject to the civil service laws, and fix their compensation without regard to the

---

1. Said act as pertinent herein reads as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2(f) of the Act of August 20, 1937 (50 Stat. 731), as amended by the Act of March 6, 1940 (54 Stat. 47), is hereby amended to read as follows:

\* \* \* \* \* \*

"Sec. 5. Section 2(a) of the said Act is hereby amended by striking the language inserted by section 1 of the Act of March 6, 1940 (54 Stat. 47); and section 10 of the said Act is hereby amended to read as follows:

\* \* \* \* \* \*

" '(b) The Administrator, the Secretary of War, and the Federal Power Commission, respectively, are authorized to appoint, subject to the civil-service laws, such officers and employees as may be necessary to carry out the purposes of this Act, the appointment of whom is not otherwise provided for, and to fix their compensation in accordance with the Classification Act of 1923, as amended. The Administrator may employ laborers, mechanics, and workmen in connection with construction work or the operation and maintenance of electrical facilities (hereinafter called 'laborers, mechanics, and workmen'), subject to the civil-service laws, and fix their compensation without regard to the Classification Act of 1923, as amended, and any other laws, rules, or regulations relating to the payment of employees of the United States except the Act of May 29, 1930 (46 Stat. 468), as amended, to the extent that it otherwise is applicable."

\* \* \*

\* \* \* \* \* \*

Classification Act of 1923, as amended, and any other laws, rules, or regulations relating to the payment of employees of the United States, except the Act of May 29, 1930 (46 Stat. 468), as amended, to the extent that it otherwise is applicable * * *."

Since 1945 Bonneville has thus had the latitude and authority necessary to provide fair and equitable compensation for its hourly employees, including plaintiffs, at rates consistent with those paid in the utility area it served even if this should be inconsistent with pay practices for other federal employees. This authority was granted by Congress with the full realization that Bonneville sought to deviate substantially from the usual pay practices of the Federal Government. It was special legislation enacted to enable Bonneville to function as and compete for employees with private electrical utilities in the Pacific Northwest.

We now leave the 1945 Act and discuss an act of Congress passed in 1949 known as the Classification Act of 1949 (Act of October 28, 1949, 63 Stat. 954). The act as material herein provides as follows:

*Title I—Declaration of Policy*

*Sec.* 101. It is the purpose of this Act to provide a plan for classification of positions and for rates of basic compensation whereby—

(1) in determining the rate of basic compensation which an officer or employee shall receive, (A) the principle of equal pay for substantially equal work shall be followed, and (B) variations in rates of basic compensation paid to different officers and employees shall be in proportion to substantial differences in the difficulty, responsibility, and qualification requirements of the work performed and to the contributions of officers and employees to efficiency and economy in the service; and

(2) individual positions shall, in accordance with their duties, responsibilities, and qualification requirements, be so grouped and identified by classes and grades, as defined in section 301, and the various classes shall be so described in published standards, as provided for in title IV, that the resulting position-classification system can be used in all phases of personnel administration.

*Title II—Coverage and Exemptions*

*Sec.* 201. (a) For the purposes of this Act, the term "department" includes (1) the executive departments, (2) the independent establishments and agencies in the executive branch, including corporations wholly owned by the United States, (3) the Administrative Office of the United States Courts, (4) the Library of Congress, (5) the Botanic Garden, (6) the Government Printing Office, (7) the General Accounting Office, (8) the Office of the Architect of the Capitol, and (9) the municipal government of the District of Columbia.

(b) Subject to the exemptions specified in section 202, and except as provided in sections 204 and 205, this Act shall apply to all civilian positions, officers, and employees in or under the departments.

*Sec.* 202. This Act (except title XII) shall not apply to—

\* \* \* \* \* \*

(7) employees in recognized trades or crafts, or other skilled mechanical crafts, or in unskilled, semiskilled, or skilled manual-labor occupations * * whose compensation shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates;

\* \* \* \* \* \*

Section 1204 of the said Classification Act of 1949 further states:

All laws or parts of laws inconsistent with this Act are hereby repealed *to the extent of such inconsistency.* [Emphasis supplied.]

Relying on said section 1204, plaintiffs' main thrust in this case is (we quote

specifically from Plaintiffs' Brief in Support of Plaintiffs' Motion for Summary Judgment, at pp. 34–35):

> That portion of the Act of October 23, 1945, which authorized the Administrator of Bonneville to fix wages of "laborers, mechanics, and workmen * * * without regard to the Classification Act of 1923, as amended, and any other laws, rules or regulations relating to the payment of employees of the United States" is as inconsistent with the Classification Act and the wage board exemption clause in section 202(7) as the special authority of the Alaska Railroad or the Virgin Islands Corporation. The Congress did not see fit to exclude Bonneville as an agency, and therefore, its white collar employees were automatically subject to the Classification Act (which they are) and its wage board employees fell into the general exemption clause in section 202(7). *Being exempted by section 202(7) automatically subjects these wage board employees to the provisions of section 5544(a) requiring that regular Sunday duty be paid for at premium rates.* [Emphasis plaintiffs'.]

Plaintiffs' reference to section 5544(a) is 5 U.S.C. § 5544(a) (1966), which was amended by section 405(f) of the Act of July 18, 1966 (80 Stat. 298). The amendment was as follows:

> The first paragraph of section 23 of the Independent Offices Appropriation Act, 1935, as amended (5 U.S.C. § 673c), is amended by inserting immediately before the period at the end thereof the following: ": *Provided further,* That employees subject to this section whose regular work schedule includes an eight-hour period of service any part of which is within the period commencing at midnight Saturday and ending at midnight Sunday shall be paid extra compensation at the rate of 25 per centum of his hourly rate of basic compensation for each

hour of work performed during that eight-hour period of service".

Defendant's reply to plaintiffs' foregoing thrust is as follows (quoting from Defendant's Reply to Plaintiffs' Response to Defendant's Cross Motion for Summary Judgment, at p. 7):

> Plaintiffs claim the authority given to Bonneville in 1945 by the Congress is inconsistent with that set forth in Section 202(7) of the 1949 Classification Act (Pltfs' Reply Br., p. 13). Plaintiffs, however, cite no provision of the 1949 Classification Act which is inconsistent with the extraordinary authority granted to Bonneville in 1945. All Section 202(7) of the 1949 Classification Act does is exclude skilled and semi-skilled workmen whose wages are fixed in accordance with prevailing rates consistent with the public interest. Nothing more. Where is the inconsistency? Plaintiffs were excluded from the Classification Act of 1923, and as a result of Section 202(7) were specifically exempted from the Classification Act of 1949. [Footnote omitted.]

Plaintiffs' counsel well argued the case before this court but when questioned specifically as to what is the inconsistency, his reply was not satisfactory. Plaintiffs' briefs do not specifically point to any inconsistency.

We agree with defendant for reasons hereinafter stated and hold that there is no inconsistency. Therefore, the 1945 law (Section 10(b) of the Bonneville Project Act) was not repealed and as amended by the Classification Act of 1949, reads as follows:

> * * * The Administrator may employ laborers, mechanics and workmen in connection with construction work or the operation and maintenance of electrical facilities * * * subject to the civil service laws, and fix their compensation without regard to the Classification Act of 1949,[2] *and any other laws, rules, or regulations*

---

2. The 1945 Act originally read "Classification Act of 1923" but Section 1106 of the 1949 Classification Act provided that references to the Classification Act of 1923 should henceforth be considered to mean the "Classification Act of 1949."

*relating to the payment of employees of the United States. * * * [Emphasis supplied.]*

We emphasize the portion which reads "without regard to * * * *any other laws, rules, or regulations relating to the payment of employees of the United States"* because the 1966 act which provided the 25 per cent for extra work on Sundays is a law relating to the payment of employees of the United States. Therefore, the result is plaintiffs' wages may be fixed without regard to the said 1966 act.

▮ Plaintiffs' first and strongest argument in their opening brief was to point to the 1958 text of section 832i(b) of title 16, United States Code, and the historical note following section 832i.[3] The 1958 text as noted in the historical note omits:

**3.** "The Administrator, the Secretary of the Army, and the Federal Power Commission, respectively, are authorized to appoint, subject to the civil-service laws, such officers and employees as may be necessary to carry out the purposes of this chapter, the appointment of whom is not otherwise provided for, and to fix their compensation in accordance with the Classification Act of 1949. The Administrator may employ laborers, mechanics, and workmen in connection with construction work or the operation and maintenance of electrical facilities (hereinafter called 'laborers, mechanics, and workmen'), subject to the civil-service laws. The Administrator is further authorized to employ physicians, under agreement and without regard to civil-service laws or regulations, to make physical examinations of employees or prospective employees who are or may become laborers, mechanics, and workmen. The Administrator, the Secretary of the Army, and the Federal Power Commission, respectively, are also authorized to appoint, without regard to the civil-service laws, such experts as may be necessary for carrying out the functions entrusted to them under this chapter."

The historical note following section 832i states:

"*References in Text.* The civil-service laws, referred to in the text, are classified generally to Title 5, Executive Departments and Government Officers and Employees.

"The Classification Act of 1949, referred to in the text, is classified to chapter 21 of Title 5.

\*     \*     \*     \*     \*     \*

"*Codification.* The Department of War was designated the Department of the Army and

Provisions of subsec. (b) which authorized the Administrator to fix the compensation of laborers, mechanics and workmen without regard to the civil-service laws and any other laws, rules, or regulations relating to the payment of employees of the United States * * *.

Since 16 U.S.C. § 832 and subparagraphs (a) to (*l*) thereunder, listed as Chapter 12B, specifically refer to the Bonneville Project only, plaintiffs naturally were led to believe that said section 832i(b) as codified and recited in footnote 3 was the present amended status of the statute. But errors do occur in codification and where there is a conflict between the codification and the Statutes at Large, the Statutes at Large must prevail.[4] We held in *American Export*

the title of the Secretary of War was changed to Secretary of the Army by section 205(a) of act July 26, 1947, ch. 343, title II, 61 Stat. 501. Section 205(a) of act July 26, 1947, was repealed by section 53 of act Aug. 10, 1956, ch. 1041, 70A Stat. 641. Section 1 of act Aug. 10, 1956, enacted 'Title 10, Armed Forces' which in sections 3011–3013 continued the military Department of the Army under the administrative supervision of a Secretary of the Army.

"Provisions of subsec. (b) which authorized the Administrator to fix the compensation of laborers, mechanics and workmen without regard to the civil-service laws and any other laws, rules, or regulations relating to the payment of employees of the United States and which authorized the Administrator, the Secretary of the Army and the Federal Power Commission to fix the compensation of experts without regard to the Classification Act of 1949, were omitted since the positions referred to are now in the classified civil service and subject to the applicable compensation schedules."

**4.** It has been held that even codification into positive law will not give the code precedence where there is a conflict between the codification and the Statutes at Large. *United States v. Welden,* 377 U.S. 95, 84 S.Ct. 1082, 12 L.Ed.2d 152 (1964) (n. 4); *Stephan v. United States,* 319 U.S. 423, 63 S.Ct. 1135, 87 L.Ed. 1490 (1943); *Warner v. Goltra,* 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254 (1934); *Nashville Milk Co. v. Carnation Co.,* 238 F.2d 86 (7th Cir. 1956), *aff'd* 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958); *Royer's, Inc. v. United States,* 265 F.2d 615 (3rd Cir. 1959). The codification is only prima facie evidence of the law. 1 U.S.C. § 204(a) (1970).

*Lines, Inc. v. United States,* 290 F.2d 925, 929, 153 Ct.Cl. 201, 207 (1961):

> It is well settled that "the Code cannot prevail over the Statutes at Large when the two are inconsistent." * *

So the fact that 16 U.S.C. § 832i(b) as it is now codified elminated the clause "fix the compensation of laborers, mechanics and workmen without regard to the civil-service laws and any other laws, rules, or regulations relating to the payment of employees of the United States" is not controlling. The basic question still is whether the 1945 Act is inconsistent with the Classification Act of 1949.

■ Plaintiffs argue that there was a repeal by implication and give various reasons for the implication. As a general rule, repeals by implication are not favored. *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm'n,* 393 U.S. 186, 89 S.Ct. 354, 21 L.Ed.2d 334 (1968); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *United States v. Zacks,* 375 U.S. 59, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963); *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Federal Trade Comm'n v. A.P.W. Paper Co.,* 328 U.S. 193, 66 S.Ct. 932, 90 L.Ed. 1165 (1946); *Posadas v. National City Bank,* 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351 (1936); *Ely v. Velde,* 451 F.2d 1130 (4th Cir. 1971).

Within the past six months the Court in *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 has stated at pp. 133–34, 95 S.Ct. at p. 353 (1974):

> In sum, we cannot find that the legislative history supports the argument that the Rail Act should be construed to withdraw the Tucker Act remedy. The most that can be said is that the Act is ambiguous on the question. In that circumstance, applicable canons of statutory construction require us to conclude that the Rail Act is not to be read to withdraw the remedy under the Tucker Act.

One canon of construction is that repeals by implication are disfavored. See, e. g., *Mercantile National Bank v. Langdeau,* 371 U.S. 555, 565 [83 S.Ct. 520, 525, 9 L.Ed.2d 523] (1963); *United States v. Borden Co.,* 308 U.S. 188, 198, 199 [60 S.Ct. 182, 188, 84 L.Ed. 181] (1939); *Amell v. United States,* 384 U.S. 158, 165–166 [86 S.Ct. 1384, 1388–1389, 16 L.Ed.2d 445] (1966). Rather, since the Tucker Act and the Rail Act are "capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551 [94 S.Ct. 2474, 2483, 41 L.Ed.2d 290] (1974). Moreover, the Rail Act is the later of the two statutes and we agree with the Special Court that

"A new statute will not be read as wholly or even partially amending a prior one unless there exists a 'positive repugnancy' between the provisions of the new and those of the old that cannot be reconciled. * * * This principle rests on a sound foundation. Presumably Congress had given serious thought to the earlier statute, here the broadly based jurisdiction of the Court of Claims. Before holding that the result of the earlier consideration has been repealed or qualified, it is reasonable for a court to insist on the legislature's using language showing that it has made a considered determination to that end. * * *" *In re Penn Central Transportation Company,* 384 F.Supp. 895 at 943.

The Court in *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482 (1974), also regarding repeal by implication stated:

> This is a prototypical case where an adjudication of repeal by implication is not appropriate. The preference is a longstanding, important component of the Government's Indian program. The anti-discrimination provision, aimed at alleviating minority discrimination in employment, obviously is designed to deal with an entirely differ-

ent and, indeed, opposite problem. Any perceived conflict is thus more apparent than real.

In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable. *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 456–457 [65 S.Ct. 716, 725–726, 89 L.Ed. 1051] (1945). Clearly, this is not the case here. * * *

* * * * * *

The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible * * *. The intention of the legislature to repeal 'must be clear and manifest.'" *United States v. Borden Co.,* 308 U.S. 188, 198 [60 S.Ct. 182, 188, 84 L.Ed. 181] (1939). In light of the factors indicating no repeal, we simply cannot conclude that Congress consciously abandoned its policy of furthering Indian self-government when it passed the 1972 amendments.

This court in *Casman v. United States,* 181 F.Supp. 404, 406, 143 Ct.Cl. 16, 20 (1958), stated:

It is a familiar rule that repeal by implication is found only by reason of necessity, and repeals by implication are consistently frowned upon. * *

We must also remember that it is a recognized rule that special statutes will prevail over general statutes without regard to the priority of enactment. *General Dynamics Corp. v. United States,* 324 F.2d 971, 163 Ct.Cl. 219 (1963); *General Motors Corp. v. United States,* 292 F.2d 502, 155 Ct.Cl. 267 (1961); *Panama Canal Co. v. Anderson,* 312 F.2d 98 (5th Cir. 1963), *cert. denied,* 375 U.S. 832, 84 S.Ct. 43, 11 L.Ed.2d 63;

*Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); *Bulova Watch Co. v. United States,* 365 U.S. 753, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961); *United States v. Nix,* 189 U.S. 199, 23 S.Ct. 495, 47 L.Ed. 775 (1903). In *Morton v. Mancari, supra* 417 U.S. at 550–51, 94 S.Ct. at 2483, the Court clearly stated the rule:

Furthermore, the Indian preference statute is a specific provision applying to a very specific situation. The 1972 Act, on the other hand, is of general application. *Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.* See, e. g., *Bulova Watch Co. v. United States,* 365 U.S. 753, 758 [81 S.Ct. 864, 6 L.Ed.2d 72] (1961); *Rodgers v. United States,* 185 U.S. 83, 87–89 [22 S.Ct. 582, 583–585, 46 L.Ed. 816] (1902). [Emphasis supplied.]

The legislative history of the 1945 amendments to the Bonneville Project Act demonstrates Bonneville was given special authority in matters of employees' pay not subject to the 1923 Classification Act. As the 1949 Classification Act was only a substitute for the earlier act and did not specifically repeal the 1945 special legislation amending the Bonneville Project Act, Bonneville's employees are still excepted from that act by Section 10(b) of the Bonneville Project Act. As above stated, special statutes will prevail over general ones without regard to priority of enactment.

During the argument and in their briefs, plaintiffs relied very much on a 1959 decision of the Comptroller General, reported in 38 Comp.Gen. 538 (1959), which stated at 542 that laborers and mechanics of Bonneville:

* * * are excepted from the Classification Act of 1949 by reason of paragraph (7) of section 202 of that act and not by the provisions of section 10 of the act of August 20, 1937, as amended, 16 U.S.C. 832i(b) * *.

The question involved in that decision was whether Public Law 85–872 (now 5 U.S.C. § 5343 (1966)), which required wage determinations made by wage boards to be implemented within 45 days, was applicable to increases in compensation which were granted as a result of collective bargaining under labor management agreements entered into by the following agencies in the Department of the Interior:

Alaska Railroad
Bonneville Power Administration
Southwestern Power Administration
Bureau of Mines
Bureau of Reclamation

The Comptroller General solicited the opinion of the Civil Service Commission (hereinafter CSC) which, under Section 203 of the Classification Act of 1949 (5 U.S.C. § 5103 (1966)), was "authorized and directed to determine finally the applicability of sections 201 and 202" of the act. The CSC answered as shown below.[5] Plaintiffs argue that the CSC ruled that Section 202(7) of the Classification Act of 1949 is the authority for fixing wage rates for Bonneville wage board employees. We do not agree. We interpret the CSC's views to mean that under the circumstances in which it arose, Bonneville employees were excluded from the coverage of the 1949 Classification Act by Section 202(7) of that act. That is all the Comptroller General ruled. The whole superseding argument of the CSC circulates around an obviously misguided interpretation of Section 1106(a) of the Classification Act of 1949. Section 1106(a) reads as follows:

(a) Whenever reference is made in any other law to the Classification Act of 1923, as amended, such reference shall be held and considered to mean this Act.

The CSC interprets this simple section as superseding all exceptions to the Classification Act of 1923. The CSC concluded that since references to the Classification Act of 1923 mean the Classification Act of 1949, any exceptions referring to the 1923 act would only be exceptions to the 1949 act if listed as exceptions in that act. This is an unreasonable reading of Section 1106(a). Our interpretation is that all Section 1106(a) is doing is substituting the "Classification Act of 1949" for the "Classification Act of 1923" wherever reference to the "Classification Act of 1923" appears in any other statute. (See footnote 2.) This is the only reasonable interpretation of Section 1106(a). The CSC interpretation is misguided. It is significant that the misguided language of the CSC that the 1945 Act of Bonneville was "superseded" by the Classification Act of 1949 was not incorporated into the Comptroller General's opinion. Even though disregarded by the Comptroller General, plaintiffs urge the misguided "superseding" language of the CSC as controlling in this case. We cannot agree with plaintiffs.

The dissent expresses a view that Section 203 of the Classification Act of 1949 forecloses this court's superseding the CSC's interpretation. It is our view that the determination of whether a subsequent statute has, by implication, repealed a prior one is for the courts. *Dis-*

---

5. " * * * The Commission believes that this provision [referring to 10(b) of the Bonneville Project Act as amended, Section 5b of the Act of October 23, 1945] was superseded by the Classification Act of 1949.

"Section 201(b) of the Classification Act of 1949 provides that 'Subject to the exemptions specified in section 202, and except as provided in sections 204 and 205, this Act shall apply to all civilian positions, officers, and employees in or under the departments.' Attention is also invited to the provisions of section 1106 of the Act:

'(a) Whenever reference is made in any other law to the Classification Act of 1923, as amended, such reference shall be held and considered to mean this Act. * * *

\* \* \* \* \* \*

"Thus *all exceptions* from the Classification Act of 1923 were superseded by the 1949 Act, and no exceptions from the 1949 Act were made unless they were specified in section 202. * * *

\* \* \* \* \* \* \*

"Accordingly, it is our view that laborers and mechanics of the Bonneville Power Administration *are excepted* from the Classification Act of 1949 by reason of section 202(7) of that act." * * * [Emphasis supplied.]

*trict of Columbia v. Hutton,* 143 U.S. 18, 27–28, 12 S.Ct. 369, 36 L.Ed. 60 (1892); *United States v. Claflin,* 97 U.S. 546, 549, 24 L.Ed. 1082 (1878). Furthermore, in *Scroggins v. United States,* 397 F.2d 295, 297, 184 Ct.Cl. 530, 533–534, *cert. denied,* 393 U.S. 952, 89 S.Ct. 379, 21 L.Ed.2d 363 (1968), this court in dealing with language similar to the language used in the case in a parallel situation involving the CSC stated as follows:

> The Retirement Act provides (5 U.S.C. § 8347 (1964 Supp. II), formerly 5 U.S.C. § 2266) that "the Commission shall determine questions of disability and dependency" and its decisions "concerning these matters are final and conclusive and are not subject to review." This is a special and unusual restriction on judicial examination, and under it courts are not as free to review Commission retirement decisions as they would be if the "finality" clause were not there. We have said that, at best, a court can set aside the Commission's determination "only were there has been a substantial departure from important procedural rights, *a misconstruction of the governing legislation,* or some like error 'going to the heart of the administrative determination.'" *Gaines v. United States,* 158 Ct.Cl. 497, 502, *cert. denied,* 371 U.S. 936 [83 S.Ct. 309, 9 L.Ed.2d 271] (1962). * * * [Emphasis supplied.]

In the present case the CSC determination was clearly "a misconstruction of the governing legislation."

Defendant submits two additional decisions of the Comptroller General:

(1) The St. Lawrence Seaway Development Corporation decision (46 Comp. Gen. 176 (1966)) holding that the Sea-

way's practice of paying a 50 per cent premium for Sunday work had to be discontinued after the 1966 25 per cent Sunday premium law came into effect.

(2) The Veterans Administration decision of May 1, 1972, identified as B–175452, concerning a proposal relative to call-back overtime. The Comptroller held that since 5 U.S.C. § 5542 (1966) provides that "unscheduled overtime work performed by an employee on a day when work was not scheduled for him, or for which he is required to return to his place of employment, is deemed at least 2 hours in duration; * * *", a proposal by the American Federation of Government Employees for 4 hours overtime must be rejected as being not legally acceptable. The ruling was that "2 hours is therefore the maximum that may be paid in the absence of work beyond such period."

These two opinions illustrate exactly why Bonneville was given authority to fix the compensation of its "laborers, mechanics, and workmen * * * without regard to the Classification Act of 1923 [later 1949], as amended, and any other laws, rules or regulations relating to the payment of employees of the United States." At the time the 1945 Act was passed, the primary purpose was to give Bonneville a free hand in competing with the private utility companies in the Northwest region. This was especially so relative to matters relating to holiday pay, Sunday pay, overtime pay, call-back pay and other similar pay matters. This is clearly brought out in the hearings on H.R. 2690 and H.R. 2693, Bills to Amend the Bonneville Project Act (H.R. 2690 was passed October 23, 1945). C. Girard Davidson, General Counsel of Bonneville, testified as shown below.[6] A careful reading of the quoted

---

6. "Ordinary Government procedure was not designed for use in a business operation of that nature and magnitude, and it has at times hampered the Administrator to an unwarranted extent. H.R. 2690 and H.R. 2693 are based on the premise that *Bonneville is a regional and business agency* and they would permit it to operate in a more business like manner.

\* \* \* \* \* \*

"Most of the labor practices with which the Administrator cannot at present conform, and which put him in an unfortunate position in the present labor market, relate directly or indirectly to the compensation received by employees.

\* \* \* \* \* \*

testimony strengthens the defendant's argument that the 1945 Act was not only sensible but its purpose, to enable Bonneville to be in competition with private utilities in its labor-management problems, must be carried out.

One of defendant's arguments which plaintiffs have not been able to answer is that plaintiffs' position that there was an implied repeal is at direct odds with subsequent pronouncements by Congress. Defendant has incorporated into his moving brief a 70-page Report No. 192 of the Senate, 82nd Congress, 1st Session, entitled Labor-Management Relations in the Bonneville Power Administration, dated March 21, 1951. The Classification Act of 1949 was enacted October 28, 1949. Plaintiffs claim that the act repealed Section 10(b) of the 1945 Act. This Senate Report made only 17 months after the passage of the Classification Act of 1949, at p. 15, recites Section 10(b) of the 1945 Act:

* * * The Administrator may employ laborers, mechanics, and workmen in connection with construction work on the operation and maintenance of electrical facilities (hereinafter called "laborers, mechanics, and workmen"), subject to the civil-service laws, and fix their compensation without regard to the Classification Act of 1923, as amended, and any other laws, rules, or regulations relating to the payment of employees of the United States * * *.

And with relation to said 1945 Act, the Report states as follows:

Part of the legislation just cited was brought into being in 1945, when the Bonneville Project Act was amended through Public Law 201, Seventy-ninth Congress, chapter 433, first session, when BPA found itself confronted with dissatisfaction on the part of its hourly and trade employees. The act creating BPA proved inadequate in meeting conditions confronting it. It did not make for good relations between labor and management. The 1945 amendments and other sections as dealt with in section V of this report, constituted an effort by Bonne-

"1. Holiday pay: Bonneville can pay only straight time on holidays whereas private employers pay their employees time and one half for the same work. The difficulty is accentuated by the fact that Bonneville employees receive straight time on holidays within their regular tour of duty whether or not they work.

"2. Daily overtime: *Bonneville can pay overtime only after 40 hours have been worked in one week.* Under normal conditions it cannot pay overtime for more than 8 hours work in 1 day as do private utilities and contractors. Under the Government's broad war powers Bonneville is able to pay overtime for hours worked in excess of eight per day, but that authority, of course, is temporary.

"3. Emergency and call work: When an employee is called to work because of an emergency such as the breaking of a line, private utilities pay for a minimum of 2 hours regardless of whether an employee works a lesser time. Similar minimum payments are made for longer periods. Bonneville is unable to pay its employees on the same basis.

"4. Night differential: Bonneville cannot pay higher rates for night shifts as is done by some private employers.

"5. Multiple shifts: Other private employers and most private utilities do not pay a higher rate for night shifts, but accomplish night differential by allowing 8 hours pay for 7½ hours' work on the late shifts. Bonneville is unable to make such adjustments.

"6. Sunday overtime: Under the 40-hour statute Bonneville can pay overtime on Sundays only for time actually worked, not for travel. If an emergency develops at a distance from an employee's station, the employee can be paid only straight time while he is traveling from his station to the point of emergency, and then only if the travel occurs during his regular tour of duty. He may be paid time and one-half for the time he actually works at the point of emergency. Private utilities pay time and one-half for travel time as well as actual working time under similar conditions.

"Differences and discriminations such as those outlined naturally breed dissatisfaction and contribute to unsatisfactory labor relations. It is but a step further to active opposition by employees and labor, generally, to the activities and programs of the administration. The Administrator is engaged in a business enterprise, and *he should be able to conform to labor practices which are customary in that business.* The language suggested for the committee's consideration would permit him to do so." [Before House Comm. on Rivers & Harbors, 79th Cong., 1st Sess., at pp. 9–10.] [Emphasis supplied.]

ville to correct a bad situation then in existence. [At p. 15.]

The Report was laudatory of Bonneville's labor relations program and it specially noted the 1945 changes. In the same session of the 81st Congress which passed the Classification Act of 1949, the Senate also passed Senate Resolution 140 which requested the above-mentioned Report. The Report is a report of the Committee on Labor and Public Welfare of the United States Senate. Since the Report is lengthy and required field studies, its preparation and completion ran into the 82nd Congress. When the Report was completed and issued on March 21, 1951, during the 82nd Congress, 10 out of the then 13 members of the Committee on Labor and Public Welfare were Senators during the 81st Congress. In *Socony Mobil Oil Co. v. United States,* 287 F.2d 910, 914, 153 Ct.Cl. 638, 646–647 (1961), this court stated:

> * * * An expression of opinion as to the meaning of a statute, made some four years after the enactment of the statute by the same Congressional committee which had considered that statute at the time of its enactment, is an important circumstance for consideration in interpreting the statute. *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 329, 62 S.Ct. 1095, 86 L.Ed. 1501.[1]"

Therefore, we consider it "an important circumstance" that the Report of the Committee did not consider Section 10(b) of the 1945 Act repealed by the Classification Act of 1949. We are aware of circumstances mentioned in the footnote to the above quotation from *Socony Mo-bil Oil Co.*[7] This case is unlike the cases referred to in the said footnote in that the Report was ordered by the same Congress and session which passed the Classification Act of 1949, and 17 months thereafter the Report clearly treats Section 10(b) of the 1945 Act as still in force. The approval of the Report by the Senate Committee on Labor and Public Welfare of the 82nd Congress, made up of 10 senators (out of 13) of the 81st Congress, is material and must not be taken lightly.

■ In addition to the above-mentioned Senate Report, defendant calls our attention to Public Law 93–454 (October 18, 1974, 93rd Congress, 2nd Session), entitled Federal Columbia River Transmission System Act. The act permits Bonneville to use its revenues for expanding the transmission system and for its operation and maintenance. It also authorizes the Administrator to issue revenue bonds and sell them to the Secretary of the Treasury to help finance construction. The bill contains a bonding limitation of $1.25 billion. Passage of this act better enables Bonneville to meet its responsibilities under the regional Hydro-Thermal Power Program in that it no longer has to rely upon year-to-year funding through Congressional appropriations. Since the act authorizes the issuance of bonds, the act is carefully drawn and the legislation contains the following language:

> * * * The provisions of the Government Corporation Control Act (31 U.S.C. 841 *et seq.*) shall be applicable to the Administrator in the same manner as they are applied to the wholly owned

---

7. "[1] *United States v. United Mine Workers,* 330 U.S. 258, 281–282, 67 S.Ct. 677, 690, 91 L.Ed. 884, is not to the contrary. That case' said only that the opinions of several Senators, some of whom had not been members of the Senate when the legislation in question had been considered, and none of whom had been members of the Committee which had reported the legislation and which opinions were expressed eleven years after the legislation had been passed, could not 'serve to change the legislative intent of Congress expressed' when the legislation had been passed. Similarly, *Rainwater v. United States,* 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996, indicates only that an interpretation by one Congress of a statute passed by another Congress more than a half century before has 'very little, if any, significance.' See also the concurring opinion of Judge Littleton in the *Equitable Life Assurance Society v. United States,* 181 F.Supp. 241, 245, 149 Ct.Cl. 316, 322, [*cert. denied* 364 U.S. 829, 81 S.Ct. 68, 5 L.Ed.2d 56], and *A. P. Green Export Co. v. United States,* 284 F.2d 383, 386–387, 151 Ct.Cl. 628."

Government corporations named in section 101 of such Act (31 U.S.C. 846), but *nothing in the proviso of section 850 of title 31, United States Code, shall be construed as affecting the powers granted in subsection (b)(11) of this section and in sections 2(f), 10(b), and 12(a) of the Bonneville Project Act* (16 U.S.C. 832 *et seq.*). [Emphasis supplied.]

We quote the above fully realizing that the 1974 act is about 25 years after the enactment of the Classification Act of 1949 and fully aware of the passage in footnote 7. But in deciding whether a statute has been repealed by implication, we may consider the consequences of such repeal. *Doolittle v. Bryan,* 55 U.S. (14 How.) 563, 14 L.Ed. 543 (1852); *Burnet v. Guggenheim,* 288 U.S. 280, 53 S.Ct. 369, 77 L.Ed. 748 (1933); *Baltimore & Phila. Steamboat Co. v. Norton,* 284 U.S. 408, 52 S.Ct. 187, 76 L.Ed. 366 (1932); *Farmers Loan & Trust Co. v. Minnesota,* 280 U.S. 204, 50 S.Ct. 98, 74 L.Ed. 371 (1930); *Clarke v. Rogers,* 228 U.S. 534, 33 S.Ct. 587, 57 L.Ed. 953 (1913). The Court in *Doolittle* noted that courts are especially averse to an implied repeal where a repeal may have an effect of unsettling titles to land. We refer to Public Law 93–454 of 1974 because it is an all-important financing act authorizing the issuance of $1.25 billion in bonds by Bonneville. Technicalities in land titles are similar to technicalities in the issuance of bonds. We are also averse to an implied repeal where a basic bond issuance and authorization act of Bonneville, authorizing issuance of bonds up to $1.25 billion, assumes by specific reference that the powers granted in Section 10(b) of the Bonneville Project Act still exist.

We have attempted to answer all of the major arguments by both parties. Plaintiffs have made other arguments such as limited or temporary authority under Section 10(b) of the 1945 Act, plaintiffs are being denied equal pay for equal work, and others. We have considered all of them but our conclusion stated in the early part of this opinion remains unchanged. Section 10(b) was not repealed by the Classification Act of 1949.

In plaintiffs' amended complaint, plaintiffs allege Sunday premium pay "because the prevailing rates in the industry provide for premium pay for Sunday work" and Bonneville "is required under law and equity to set compensation for plaintiffs in accordance with prevailing rates in the industry." The affidavit of one Cosgrove C. LeBarre, labor relations officer for Bonneville for eight years, filed by defendant, dated February 21, 1973, shows that a survey of pertinent utilities in the Pacific Northwest in 1967 showed no premium payment for regularly scheduled Sunday work. A resurvey was made as late as February, 1973; it also showed that no premium is paid for regularly scheduled Sunday work. The affidavit further states that:

> * * * In the 1967 contract negotiations between Bonneville and the Columbia Power Trades Council, in which I participated directly as the primary spokesman for Bonneville, a contract provision requiring payment of a premium of 25 per centum for work, any part of which was performed on Sunday was proposed by the Council. This was rejected by Bonneville upon the ground that such a premium was not prevailing within the electric utility industry within Bonneville's area of operations.

Plaintiffs have not filed any counter affidavits answering the affidavit of Cosgrove C. LeBarre. Plaintiffs' claim based on this alternative claim, presented by amended complaint, must be denied.

Defendant has filed a counterclaim in the event that the plaintiffs should prevail here. Since the plaintiffs have not prevailed, defendant's counterclaim is dismissed.

## CONCLUSION

Based on the reasons given in the opinion, we hereby allow defendant's cross motion for summary judgment and

deny plaintiffs' motion for summary judgment. Plaintiffs' amended complaint in *Leroy W. Abell et al. v. United States,* No. 261–72, and the complaint in *Jack R. Barger et al. v. United States,* No. 371–73, are hereby dismissed. Defendant's contingent counterclaim in both actions is also dismissed.

DAVIS, Judge (dissenting):

For me the crucial feature of this case is Section 203 of the Classification Act of 1949, 63 Stat. 956, 5 U.S.C. § 5103 (1970), which provides (as it now appears in the Code) that "[t]he Civil Service Commission shall determine *finally* the applicability of section 5102 of this title [§§ 201 and 202 of the 1949 Act] to specific positions and employees, except for positions and employees in the Office of the Architect of the Capitol" [emphasis added]. I take this to mean what it says—that the Civil Service Commission is the final arbiter. There is not the slightest constitutional impediment to such a provision by Congress where the substantive legislation concerns federal employees and the Commission decides in favor of employees' rights. That is what the Commission has explicitly done, with respect to the very question before us, in a case in which its view was officially requested and it had to pass directly on the issue. The court thinks the Commission was wrong, but section 203 seems to me to foreclose our superseding the Commission's position in favor of the employees, at the instance of the employing agency, even though the problem is a legal one. This is, as I see it, the mandate of Congress. Under the law the Bonneville Power Administration was required to follow the Commission's directive favoring the employee. All the decisions holding that there is some sort of judicial review, despite "finality" language comparable to that here, are cases in which the Commission (or other agency) decided adversely to the employee.