B. KIRK RANKIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26191, 41046.   Promulgated November 7, 1929.

J. *Gilmer Korner, Esq.*, for the petitioner.
R. *W. Wilson, Esq.*, for the respondent.

OPINION.

LITTLETON: Before passing on the deductibility of the specific items in controversy, it is necessary first to decide whether the proper basis for exhaustion of the several physical assets is over their respective lives or over the term of the lease within which the expenditures were made. And this, of course, makes necessary an examination of the agreements under which the petitioner occupied the premises in question, as well as the circumstances surrounding their execution and the acts of the parties connected therewith.

The contention of the petitioner is that the agreement executed on May 19, 1920, was a lease for two years with an option to purchase within that time and that since there was no assurance that the peti-

tioner would be allowed to occupy the premises beyond that time, and since the life of the assets was longer than two years, the amount expended for alterations and improvements should be spread over this two-year period. The foregoing conclusion is, of course, well established, but do the facts in this case justify an application of this principle? We think not. In the first place, it appears that the original agreement was more than a lease with an option to purchase within the term of the lease. On the part of the owner of the premises, there was a provision binding this party to permit the other party (the petitioner) to purchase the property at any time within the two-year term at the price therein specified, and in this respect, it might be said that the said owner merely bound herself to hold the offer to sell the property open for two years and unless the offer was accepted within that time, the lease would be considered as in full operation and no consideration need be given to the option to purchase, in determining the exhaustion on account of the capital expenditures. But there was more than an obligation on the part of the seller to keep the offer open during the two-year period; the petitioner obligated himself to accept the offer within the two-year period.

To use the language of the agreement: " The said B. Kirk Rankin, Party of the Second Part, binds and obligates himself to purchase the said property upon the terms herein set forth but he shall have two years from June 15, 1920 to purchase the same." In other words, this would seem to be an executory contract, or contract of purchase, in which the purchase was to be consummated in any event, but might be postponed for as much as two years. That the original agreement to purchase was not carried out within the time specified, but was extended on three subsequent occasions, would not alter the binding character of the contract as at first executed, except to extend the time therein specified. It is, of course, true that the renewal agreements do not contain the express clause, binding and obligating the petitioner to complete the purchase within the extended periods, yet when we read these agreements along with the original agreement and consider the entire record, we are of the opinion that the fair interpretation to be given to the renewal agreements is that each amounted to an extension of the original agreement, both as to occupancy and purchase, for a period of one year. At any time during the periods of the agreements the petitioner, upon compliance therewith, could have required specific performance of the purchase contract and a similar right existed with respect to Mary Ellen Rankin, though the time when she could require specific performance would only be at the end of the several periods mentioned. In the meantime the petitioner was occupying the premises in much the same manner that would have occurred where there was

a contract of purchase and the buyer was given the privilege of occupying the premises on a rental basis until the purchase was finally consummated. We fail to see where, under such circumstances, there exists any occasion to consider that alterations and improvements made after execution of the agreements would inure to the benefit of the petitioner only until the purchase was finally consummated. It is true that the purchase was not completed within the period of the original agreement or the original agreement as extended, nor does the record show that it was ever consummated, but the petitioner occupied the premises during the periods covered by the several agreements, thus receiving the benefit of the expenditures made, and the record strongly indicates that occupancy continued after the last agreement expired.

And, further, other evidence of record is opposed to the proposition that occupancy of the premises by the petitioner was intended by either party to be limited to the periods mentioned in the agreements. In the first place, the agreements do not contain clauses, commonly found in leases, with respect to the right of entry or repossession on the part of Mary Ellen Rankin either on the breach of the agreement or upon its termination, the language used indicating a contemplation that termination would result upon the completion of the purchase rather than upon the expiration of the periods mentioned in the agreements. The rental to be paid was 6 per cent of the agreed purchase price, with the petitioner paying taxes, insurance and the cost of alterations and improvements, and the rental terms were not changed at the expiration of the original agreement; that is, continued to be 6 per cent of the original agreed purchase price, although, in the meantime, the petitioner had made expenditures for alterations and improvements to the extent of almost half of the purchase price. And during the five-year period from June 15, 1920, to June 15, 1925, when the original agreement and the renewals were in effect, the total expenditures made by the petitioner for alterations and improvements amounted to $29,631.14, or but little less than the agreed purchase price of $30,000. Further, the petitioner testified that while he took over the premises as an emergency proposition, he did this with the purpose of making this his permanent place of business and, as heretofore stated, this purpose was apparently carried out. It is hardly probable that a man would expend the amounts here expended—particularly when we consider their comparison with the agreed value of the property at date of the execution of the original agreement—unless there was intended and assured to him more than a temporary occupancy of the building. In substance, if not also in form, the transaction is one wherein the occupancy began and continued with the purpose and assurance that occupancy would be continued for an indefinite period of time.

1308

And, as we said in *Sentinel Publishing Co.*, 2 B. T. A. 1211, "Where the weight of evidence shows, as in this case, that the occupancy of the premises by the taxpayer was for an indefinite period, the allowance for exhaustion, wear, and tear must be based upon the physical life of the property." In view of the foregoing, the action of the Commissioner in allowing a deduction for the exhaustion of the improvements over the physical life of the property is sustained.

With respect to the other deductions in controversy for the fiscal year ended June 30, 1923, we are of the opinion that the item of $659.07, wages and expenses of an expert pressman to instruct petitioner's employees in the operation of a new color press, is a proper deduction from gross income for that year, but that the item of $82.77, labor and material used in making motor base and setting new motor, is a capital item and, therefore, not deductible. As to the fiscal year ended June 30, 1924, we are of the opinion that the item of $1,205.95 fairly represents the original cost of the stolen parts and is a proper deduction for that year, but that the other items, $555.69 and $539.59, are capital expenditures and, therefore, not deductible. It is true that the amount of the item of $555.69, wages and expenses of an expert mechanic in installing new press, was greater because of the condition under which the installation was made, but we think it would be going too far in this case to say that only installation expenditures which were ordinarily required should be capitalized, but that those which arose on account of some unforeseen contingency should be treated as deductible in the year in which made. Doubtless, in installation and construction work it is not unusual for a job to be completed under other than ideal conditions, and, therefore, we think it would be going into the realm of speculation and impractical theories to say that only ideal costs should be capitalized.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*