The **CLEVELAND ELECTRIC ILLUMINATING COMPANY**

v.

The **UNITED STATES.**

**No. 331–81T.**

United States Claims Court.

Jan. 9, 1985.

**222**

Eric M. Oakley, Cleveland, Ohio, for plaintiff. W.H. Lutz, T.G. Perris, F.L. Fisher, M.G. Meissner and Squire, Sanders & Dempsey, Cleveland, Ohio, of counsel.

Stella A. Gieseler, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L.

Archer, Jr., for defendant. Theodore D. Peyser, Washington, D.C., of counsel.

## OPINION ON EMPLOYEE TRAINING AND ADVERTISING EXPENSE ISSUES

PHILIP R. MILLER, Judge.

*Question Presented*

In this suit for refund of federal income taxes paid for the years 1970, 1971, and 1972 the question at issue is whether certain expenditures incident to putting into operation two new electric generating facilities, including a nuclear plant, were capital expenditures, as determined by the Commissioner of Internal Revenue, or ordinary and necessary expenses incurred in carrying on plaintiff's business, as contended by plaintiff (Cleveland Electric or CEI). The expenditures at issue are the cost of training employees to operate the two generating plants, the cost of training employees to replace personnel transferred to the new facilities, and the cost of an advertising campaign undertaken in connection with the nuclear plant.

*Ordinary Expenses and Capital Expenditures Generally*

I.R.C. § 162(a) allows deduction of expenses which are (1) ordinary, (2) necessary, (3) paid or incurred during the taxable year, and (4) in carrying on any trade or business. "The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction * * * between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset." *Commissioner v. Lincoln Savings & Loan Assn.*, 403 U.S. 345, 353, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519 (1971), *citing Commissioner v. Tellier*, 383 U.S. 687, 689–90, 86 S.Ct. 1118, 1119–20, 16 L.Ed.2d 185 (1966). And this dichotomy is reinforced by I.R.C. § 263(a) (and *see also* §§ 161 and 261), which bars deductions for capital expenditures.

Plaintiff contends that since expenditures for training of employees and advertising are generally ordinary expenses in

its business, there is no good reason why they should not be so treated here; whereas defendant insists that the expenditures were not ordinary but capital, because they were actually part of the cost of acquisition of the new generating plants, they were incurred before the plants became operational, they were designed to provide benefits in later years rather than in the taxable years, and they were incurred pursuant to obligations under agreements with other electric utility companies.

In support of its argument plaintiff claims that statements in the opinion in *Commissioner v. Lincoln Savings & Loan Ass'n,* 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971), repudiate earlier decisions of other courts and put a new perspective upon the standards of what is an ordinary expense. In that case the Court held that certain additional premiums paid in 1963 by a state-chartered savings and loan association to the Federal Savings and Loan Insurance Corporation (FSLIC) under the compulsion of § 404(d) of the National Housing Act, 12 U.S.C. § 1727(d), were not deductible by the savings association, for income tax purposes, as ordinary and necessary business expenses under § 162(a). The Court's reasons were that: (A) The premiums were part of a secondary reserve to be used only if all other assets of FSLIC were insufficient to cover its losses; (B) The insured institution had a distinct and recognized property interest in the secondary reserve, including the right to transfer, to obtain a refund, to use it to pay its basic premium, to have it accounted for separately, and to receive a share of FSLIC's earning thereon; (C) All concerned treated the insured institution's share of the secondary reserve as an asset on their financial statements and books of account; and (D) Congress in its treatment of FSLIC reserves had treated the secondary reserve as a permanent asset or capital rather than as an expense.

The notion that *Lincoln Savings & Loan Ass'n* made new law and repudiated old law as to what is an ordinary expense under § 162 is hardly consistent with the Court's reiteration of the underlined por-

tions of the well-known statement of Mr. Justice Cardozo in *Welch v. Helvering,* 290 U.S. 111, 115–16, 54 S.Ct. 8, 9–10, 78 L.Ed. 212 (1933), on the same question (*Lincoln Savings & Loan Ass'n,* 403 U.S. at 353, 91 S.Ct. at 1898):

> [T]he decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle. [Underlining supplied.]

Plaintiff relies first upon the following sentence in *Lincoln Savings & Loan Ass'n* for the alleged change (*Id.*):

> [T]he presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year.

But if this was a change, the Supreme Court seems to have been unaware of it. In the same opinion the Court emphasized that an important difference between the primary FSLIC insurance premium and the additional insurance premium at issue was that (*Id.* at 357, 91 S.Ct. at 1900):

> The former * * * is only annual in phase and operation. It provides insurance for the year. When the year passes, the insurance ceases. The latter, however, provides a fund available for losses not only in the current year, but in the future.

And one year later, when the same Court decided in *United States v. Mississippi Chemical Co.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972), that the required purchase of shares of a class C stock of a federal bank for cooperatives, in a fixed proportion to the interest paid to the bank, on loans by a farmers cooperative association, was not deductible as additional interest paid but was the purchase of a capital asset, the Court reasoned (*Id.* at 310, 92 S.Ct. at 915):

Since the security is of value in more than one taxable year, it is a capital asset within the meaning of § 1221 of the Code, and its cost is non-deductible. *Cf. Commissioner v. Lincoln Savings & Loan Assn.*, 403 U.S. 345 [91 S.Ct. 1893, 29 L.Ed.2d 519] (1971); *Old Colony R. Co. v. United States*, 284 U.S. 552 [52 S.Ct. 211, 76 L.Ed. 484] (1932); 26 C.F.R. § 1.461–1.

The Court's reference in *Mississippi Chemical* to 26 C.F.R. § 1.461–1 undoubtedly refers to subsection (a)(1) of that regulation which provides as a part of the general rule for the year of a deduction:

If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible or may be deductible only in part, for the taxable year in which made. * * * See section 263 and the regulations thereunder for rules relating to capital expenditures.[1]

█ As the quoted excerpts indicate, although the cost of replacing a broken window is a deductible expense in the year of replacement, despite the benefits therefrom in ensuing years, the fact that a substantial expenditure is likely to give long-lived benefit, or is connected with the acquisition of an asset having an extended life, is always an important, if not dominant, factor in the direction of tangible or intangible capital asset treatment. This is because it enables matching of the revenues and the cost of producing them over the extended life of the asset. As *Welch v. Helvering*, 290 U.S. at 114, 54 S.Ct. at 9, noted, it is a matter of degree, not of kind.

In the recent decision in *Ellis Banking Corp. v. Commissioner*, 688 F.2d 1376 (11th Cir.1982), *reh'g denied*, 698 F.2d 1238, *cert. denied*, 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983), the Eleventh Circuit succinctly pointed out that capital treatment of expenditures connected with the acquisition of an asset having an extended life is an important facet of match-

ing revenues and expenditures in determining net income. The holding there was that expenditures incurred in the investigation of the financial condition of a corporation, in preparation for the proposed acquisition of its stock, were required to be capitalized. In arriving at that holding, the court stated in part (*Id.* at 1379–80):

The function of these rules is to achieve an accurate measure of net income for the year by matching outlays with the revenues attributable to them and recognizing both during the same taxable year. When an outlay is connected to the acquisition of an asset with an extended life, it would understate current net income to deduct the outlay immediately. To the purchaser, such outlays are part of the cost of acquisition of the asset, and the asset will contribute to revenues over an extended period. Consequently, the outlays are properly matched with revenues that are recognized later and, to obtain an accurate measure of net income, the taxpayer should deduct the outlays over the period when the revenues are produced.

These principles, we conclude, require capitalization of most of the expenditures in this case. Ellis expected to realize benefits over the course of its ownership of the Parkway stock, and the investigation expenditures, which were directly related to an examination of this specific property, were part of the cost to Ellis of owning the stock. Those expenditures should be deducted only when the related benefits are realized. * * * [Footnote omitted.]

Plaintiff further contends that in *Lincoln Savings & Loan Ass'n* the Supreme Court promulgated a new rule for a capital expenditure, requiring that the payment at issue create or enhance "a separate and distinct additional asset." This new rule is purportedly found in the following excerpt (*Lincoln Savings & Loan Ass'n*, 403 U.S. at 354, 91 S.Ct. at 1899):

See T.D. 6282, 1958–1 C.B. 215, 228. (22 Fed. Reg. 10686, 10690 (1957).)

---

**1.** This provision dates back to the original regulations under the 1954 Internal Revenue Code.

What is important and controlling, we feel, is that the § 404(d) payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a) in the absence of other factors not established here. * * *

Again plaintiff misreads that opinion. All the quoted excerpt states is that in the particular case what was decisive was that Lincoln's payment of the additional premiums had acquired for it a separate and distinct additional asset, a share in the FSLIC secondary reserve, and hence the payment had to be capital in nature and not an expense. It does not state, as plaintiff urges, that if the separate and distinct asset test is not met the payment is a necessary and ordinary expense.

If plaintiff's construction of *Lincoln Savings & Loan Ass'n* were correct, the Court would be deemed to have overruled without any discussion a host of Supreme Court and other decisions which held that particular expenditures were capital, or not ordinary, despite the fact that the expenditures at issue did not acquire or enhance "separate and distinct assets." *See United States v. Hilton Hotels Corp.*, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970) (cost of appraisal litigation subsequent to merger, to value shares of dissenting stockholders ancillary to payment therefor); *Woodward v. Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970) (cost of appraisal litigation to value shares of minority stockholders objecting to extension of corporate charter ancillary to redemption of the shares); *Arrowsmith v. Commissioner*, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952) (payment by stockholder of liquidated corporation of judgment against corporation); *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943) (payment by corporate parent of operating deficit of wholly owned subsidiary pursuant to contract); *Spreckels v. Commissioner*, 315 U.S. 626, 62 S.Ct. 777, 86 L.Ed. 1073 (1942)

and *Helvering v. Union Pacific Co.*, 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363 (1934) (commissions paid out on the sale of securities); *Deputy v. Dupont*, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940) (stockholder's incentive payments to corporate officers to obtain improved corporate performance); *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933) (payments made by officer of bankrupt corporation to corporation's creditors to strengthen his own credit reputation); and *see also Blitzer v. United States*, 231 Ct.Cl. 236, 268, 684 F.2d 874, 894 (1982) and cases cited therein (prepaid interest, rent, insurance premiums, fees and compensation for future services).

We consider now the particular expenditures at issue.

### Davis-Besse Training Expenses

#### Statement

On December 26, 1968, plaintiff and the Toledo Edison Company (Toledo) entered into an agreement for the construction of a nuclear power plant known as the Davis-Besse plant. The agreement provided that the unit should be owned by the two companies as tenants in common, with Toledo owning an undivided 52.5 percent interest and CEI owning an undivided 47.5 percent interest. CEI appointed Toledo as its agent, and the latter agreed, both as agent for CEI and as principal on its own behalf, to design and install the unit, to negotiate, execute, administer and enforce contracts providing for the purchase of land, materials, equipment and services for the engineering, design and construction of the unit and to use its best efforts to have the unit in commercial operation by December 1, 1974. Toledo alone was to execute contracts for $500,000 or less and to approve all invoices (irrespective of amount) and pay them out of a special bank account contributed to by both companies.

Although all costs contemplated by the construction agreement were to be shared by the company in proportion to its respective ownership interest, Toledo alone was to provide the competent and experienced

engineering and construction staff to superintend the work of the architect engineer and the constructors engaged in the design and construction of the unit. Such engineering and construction staff and all other employees of Toledo performing services in connection with the design and construction of the unit were to be considered for all purposes employees of Toledo alone, and they were to receive their instructions and orders only from appropriate officials of Toledo. Likewise, the consulting engineers, suppliers and contractors were to receive their instructions and orders from the engineering and construction staff or other appropriate officials of Toledo alone.

Included in the costs of construction expressly set forth in the construction contract were "Special Training for Specific Unit (particularly applicable to Nuclear Plants)."

The construction agreement further provided that Toledo was not to be liable to CEI for any loss, cost, damage or expense incurred by CEI as the result of any action or failure to act by Toledo in connection with the agreement or construction of the unit, and that Toledo was to arrange for appropriate insurance to cover risk of damage to or loss of the work in progress, such insurance costs however to be shared in the same proportions as other costs.

The agreement further provided that nothing contained therein should ever be construed to create an association, joint venture, trust or partnership of the two companies.

Substantially contemporaneously with the execution of the construction agreement, Toledo and CEI entered into an operating agreement for Davis-Besse unit No. 1. This agreement provided that unit No. 1 was to be operated by Toledo, which was to produce capacity and energy equal to the sums of that reserved and scheduled by Toledo and CEI. Toledo was to provide the engineering supervisory operating maintenance and other staff personnel to operate and maintain unit No. 1, and such staff were to be considered employees of Toledo exclusively and to receive their instructions

and orders only from appropriate officials of Toledo. Toledo was also to negotiate, and execute and enforce contracts, including purchase orders for the operation and maintenance of unit No. 1 either in its own name, or in its own behalf and as agent for CEI, with all costs and expenses to be shared by both owners pursuant to a schedule attached to the agreement. Neither owner was to be liable to the other for any loss, cost, damage or expense incurred by the other as a result of any action or failure to act by the other. Liability to third-persons arising out of the ownership, operation, use or maintenance of any property which was the subject of the agreement was to be shared. Insurance covering risk of damage and liability was to be arranged for and maintained by Toledo, but the cost thereof was to be jointly shared. As in the construction agreement, the parties agreed that nothing in the operating agreement was ever to be construed to create an association, joint venture, trust or partnership.

Personnel working at nuclear power plants require substantial training. The nature and the amount of this training was subject to significant regulation by the Atomic Energy Commission (AEC). In particular, operating personnel were required to be licensed by the AEC. These personnel fall into two categories: reactor operators (RO's) and senior reactor operators (SRO's). The RO license is a technician level license for which the applicant must pass a written examination and an operating test for the particular reactor at which he will be working. The SRO license applicant must pass a written examination and an operating test and must further demonstrate an ability to direct licensed RO's in a competent manner. In order to commence operations at the nuclear plant, these employees had to obtain their licenses prior to the time fuel was loaded into the reactor.

In the spring of 1971, Toledo began a training program for employees expected to operate Davis-Besse upon its completion. Initially, the training consisted of a 40-week basic academic refresher course for 2-hours per week for employees working in

the part of the company which generated electricity using fossil fuel. Early in 1972, a 17-week basic refresher course was begun for the engineers who would need AEC licenses to operate the Davis-Besse facility. Some of this training was conducted by outside contractors who manufactured or installed the equipment. In addition, the employees were sent to observe the operations at other nuclear generating plants.

As provided in the construction contract, the direct training costs associated with the Davis-Besse plant were shared in accordance with each utility's percentage of ownership in the facility. Plaintiff paid Toledo $49,769 for 1971 and $313,919 for 1972, or a total of $363,688. In its financial accounting for the years at issue plaintiff capitalized such direct training costs.

Many of the employees of the Davis-Besse facility were recruited from the ranks of employees then working in Toledo's fossil fuel plants. As a result, it was necessary for Toledo to train other new or existing employees to fill those vacancies created in its fossil fuel plants. This type of training will be referred to as displacement training.

During the years at issue, plaintiff was a member of the Central Area Power Coordination Group ("CAPCO"), which was a power pool comprised of plaintiff and four other electric utilities, including Toledo. The members of CAPCO agreed to share such displacement training costs by reimbursing the constructing utility at the rate of $1 per kilowatt of installed generating capacity. The amount of $1 per kilowatt was designed to defray the cost to the operator of a CAPCO generating facility of the large initial cost of displacement training associated with the initial staffing of the new facility. It does not include any component of normal training by the operator in connection with replacement of personnel assigned to the jointly owned facility after the commencement of operations.

For the years 1970–72, plaintiff reimbursed Toledo $430,350 for Toledo's cost for Toledo's training of replacement employees as a result of the transfers to the training of its Davis-Besse facility, at the $1 per kilowatt rate agreed upon. These sums were expensed by CEI in its financial records and statements. However, the I.R.S. capitalized such sums upon audit of plaintiff's tax returns.

*Discussion*

■ For the reasons stated hereinafter, it is concluded that both plaintiff's payments to Toledo to reimburse it for direct training of the nuclear plant employees and to reimburse it for the displacement training of additional employees should be capitalized rather than expensed.

■ A. The construction and operating agreements are explicit that plaintiff was not to be deemed a partner or joint venturer with Toledo in the Davis-Besse nuclear operation. The necessary inference is that plaintiff was a purchaser from Toledo of an undivided interest in the facility and of the right to receive a share of the electrical energy produced by Toledo therein. In any event, however the transaction or relationship is characterized, it is clear that plaintiff made the various preoperating payments to Toledo not merely for a share of the concrete, steel and uranium that went into the nuclear electric generating plant but for a share in a ready-to-operate facility, duly licensed and with a staff of trained employees. This is reflected in the construction agreement itself, which provided that plaintiff's obligation to Toledo was not only to reimburse it for a share of latter's costs of the physical construction and supervision of construction but also for its "Costs of obtaining the AEC licenses" and for the "Special Training for Specific Unit (particularly applicable to Nuclear Plants)." In the acquisition of a share in a going business, the costs attributable to both the intangible and tangible assets are capital expenditures. *Central Texas Sav. & Loan Ass'n v. United States*, 731 F.2d 1181 (5th Cir.1984), *Jack Daniel Distillery v. United States*, 180 Ct.Cl. 308, 379 F.2d 569 (1967); *Parmelee Transportation Co. v. United States*, 173 Ct.Cl. 139, 351 F.2d 619 (1965);

*Chase Candy Co. v. United States,* 130 Ct.Cl. 102, 126 F.Supp. 521 (1954).

B. A separate line of authority holds that substantial start-up costs associated with opening a new or newly acquired business are not ordinary business expenses but capital expenditures. *See Bennett Paper Corp. v. Commissioner,* 699 F.2d 450 (8th Cir.1983); *Madison Gas & Electric Co. v. United States,* 633 F.2d 512, 517 (7th Cir.1980); *Richmond Television Corp. v. United States,* 345 F.2d 901, 907 (4th Cir.), *vacated on other grounds,* 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965), *overruled on other issues, N.C.N.B. Corp. v. United States,* 684 F.2d 285, 289 (4th Cir.1982); *Todd v. Commissioner,* 77 T.C. 246, 249 (1981), *aff'd,* 682 F.2d 207 (9th Cir.1982); *Goodwin v. Commissioner,* 75 T.C. 424, 433 (1980), *aff'd,* 691 F.2d 490 (3d Cir.1982).

Although the rationale of these decisions is not fully articulated, they appear to accept or assume the underlying theory that where a business requires substantial start-up expenditures before it can begin operations, which are not directly for the purchase of tangible assets and which will not ordinarily be recovered out of revenues for the same year, the capital investment is in the business as a whole rather than merely in the tangibles, and it includes the start-up costs.

I.R.C. § 195, added by § 102(c) of the Miscellaneous Revenue Act of 1980, Pub.L. 96–605, currently allows a taxpayer an election to treat start-up expenditures in creating an active trade or business as deferred expenses to be amortized over 60 months or more. In explaining the purpose of the enactment the reports of both the House and Senate Committees stated the following with respect to preexisting law (H.R. Rep. No. 1278, 96th Cong., 2d Sess. 3, 10–11, *reprinted in* 1980–2 C.B. 709, 711–12; S.Rep. No. 1036, 96th Cong., 2d Sess. 10, 11–12, *reprinted in* 1980 U.S.Code Cong. & Ad.News 7293, 7300, 7301–02):

Under present law, costs incurred prior to the commencement of a business normally are nondeductible because they are not incurred in carrying on a trade or business. These startup or preopening costs must be capitalized and often cannot be depreciated or amortized because no ascertainable useful life can be established for these costs. However, the capitalized costs may be recovered for purposes of measuring gain or loss upon the disposition or cessation of the business.

\* \* \* \* \* \*

Eligible expenses also include startup costs which are incurred subsequent to a decision to establish a particular business and prior to the time when the business begins. For example, startup costs include advertising, salaries and wages paid to employees who are being trained and their instructors, travel and other expenses incurred in lining up prospective distributors, suppliers or customers, and salaries or fees paid or incurred for executives, consultants, and for similar professional services.

\* \* \* \* \* \*

The determination of whether there is an expansion of an existing trade or business or a creation or acquisition of a new trade or business is to be based on the facts and circumstances of each case as under present law.

While the views of a later Congress are not controlling as to the meaning and application of preexisting law, they are entitled to consideration as a secondary authoritative expression of expert opinion as to such law. *Abell v. United States,* 207 Ct.Cl. 207, 229–31, 518 F.2d 1369, 1381–82 (1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976); *A.P. Green Export Corp. v. United States,* 151 Ct.Cl. 628, 634, 284 F.2d 383, 387 (1960); *Bobsee Corp. v. United States,* 411 F.2d 231, 237 n. 18 (5th Cir.1969).

Even if the construction and agreement herein were not considered as the purchase of a new undivided interest in a business, the training expenses may appropriately be seen as start-up costs incurred by CEI jointly with Toledo to operate a new business. Prior to Davis-Besse, plaintiff was only producing electricity in conventional

fossil fuel plants. Nuclear generation of electricity differs substantially from the production of electricity in convention fossil fuel plants. First, employees at a nuclear reactor must be trained to a higher degree than those operating a fossil fuel plant due to the dangers to public safety from radiation exposure. Second, the means by which heat is produced in a nuclear plant to generate steam for the generators differs from the process in a conventional plant. Finally, support systems are required at a nuclear reactor which are not necessary at a fossil fuel plant. As such, the training expenses incurred in connection with Davis-Besse should be capitalized as a one-time expenditure necessary to begin a new business.

C. The initial training cost could be expected to have value in the production of income over an extended period of years. Their training would obviously add value to the services of the employees throughout their employment. The trained employees could be expected to assist in the training of new employees, and thus to the extent there was a turnover, the original trained corps could reduce the cost of training of the new. Also, it was reasonable to expect that the members of the original group would not leave simultaneously, and that it would not be necessary to shut down the utility plant to train a new staff. As the court stated in *Richmond Television Corp.*, 345 F.2d at 907–08, with respect to an analogous situation:

> Here, the $25,000 was paid to acquire a staff already trained by Larus in the techniques and skills of television broadcasting. This was in all regards the acquisition of a capital asset whose value to the taxpayer would continue for many years, even though from time to time individual staff members could be expected to leave its employ. The $25,000 therefore could not be taken as a current expense.

■ D. Another factor which supports the same result is that under AEC regulations, a utility was required to have personnel licensed to operate a nuclear facility before it could load nuclear fuel into the reactor. Hence, the training costs associated with Davis-Besse may be seen as part of the cost of obtaining an operating license for the nuclear facility. The right to do business confers upon the licensee an intangible property interest, and the costs of obtaining the license should be capitalized. The benefits of obtaining the license will continue to accrue beyond the taxable year in which the expenses are incurred. *Central Texas Sav. & Loan Ass'n v. United States*, 731 F.2d at 1183; *Ellis Banking Corp. v. Commissioner*, 688 F.2d 1376 (11th Cir.1982); *Nachman v. Commissioner*, 191 F.2d 934 (5th Cir.1951).

■ E. The capitalization of the direct training expenses is further supported by the evidence that plaintiff capitalized such expenditures in its own financial records and books; that its expert accountant witness approved of such treatment; that the Ohio Public Utilities Commission allowed electric utility companies to capitalize such training costs and include them in their rate base; and that Federal Power Commission and Federal Energy Regulatory Commission Uniform System of Accounts in effect since 1973 provide that pre-service direct training costs for nonconventional (nuclear) plants may be capitalized. *See* 18 C.F.R. Part 101 (Electric Plant Instructions) § 3(19) (1974 and 1984). While evidence of such general practice is not binding on the Commissioner if it does not clearly reflect income, it is of probative value in determining whether or not it clearly reflects income. *Cincinnati, N.O. & Tex. Pac. Ry*, 191 Ct.Cl. 572, 583–84, 424 F.2d 563, 570 (1970); *see also Heaven Hill Distilleries v. United States*, 201 Ct.Cl. 423, 438, 476 F.2d 1327, 1336 (1973).

F. Finally, plaintiff's reimbursement of Toledo's displacement training costs are not substantially different than plaintiff's payments for Toledo's direct costs. Had Toledo hired entirely new personnel rather than used its experienced conventional electric utility employees to operate Davis-Besse, it is reasonable to believe that its direct training costs would have been larg-

er than the amounts it incurred. Presumably it used its existing employees as its base for further training because, taking into account the additional cost of training substitutes for those displaced, it was still more economical than starting from scratch. Thus, the sum of both trainings must be deemed the cost of training of personnel to operate the nuclear plant. In any event, as far as plaintiff was concerned, the charge it was required to pay to Toledo to reimburse the latter for total training costs, represented part of plaintiff's cost for obtaining its capital interest in the Davis-Besse facility, and there is not valid reason for any different treatment.

### Advertising Costs in Connection with Davis-Besse

#### Statement

During the years at issue plaintiff spent about $1.6 million per year in advertising. Of this sum the following related to the Davis-Besse nuclear power project.

| Year | Nuclear Advertising |
|------|---------------------|
| 1970 | $42,847 |
| 1971 | 81,011 |
| 1972 | 23,841 |
| Total | $147,699 |

The Commissioner of Internal Revenue disallowed deduction of these sums as ordinary and necessary expenses on the ground that they were capital expenditures.

The purpose of the expenditures was stipulated to be as follows: Because there were relatively few nuclear power plants in operation in the United States and the public was generally believed to harbor fears and apprehensions regarding the safety of nuclear power plants, Toledo Edison and plaintiff, jointly and individually, began a public relations and education program to acquaint the general public with the facts and merits of nuclear power. This program involved essentially the dissemination of factual information on nuclear power through newspaper, radio and television advertising (including the sponsorship of radio and television programs, the distribution of printed brochures and the use of graphic displays).

Of the nuclear advertising expenses in issue, a total of $25,993 was paid by plaintiff to Toledo as a reimbursement for plaintiff's share of expenditures made by Toledo, as required by paragraph 12 of the Davis-Besse construction agreement and the appendix thereto, which included among reimbursable costs expenditures for public relations. The remaining $121,706 represents plaintiff's own in-house expenditures and payments to outside parties.

The application for issuance of a construction permit for the Davis-Besse project was under active consideration by the Atomic Energy Commission ("AEC") during most of 1969 and all of 1970. Beginning in December 1970 the AEC held public hearings on the application. The hearings were designed to permit the public to question the safety and other aspects of the nuclear plant. In February 1971, the hearings were concluded after a total of 16 days of testimony and an extended period to allow intervenors the opportunity to gather witnesses and to complete and perfect their presentations. In March 1971 the AEC's Reactor Licensing Division issued the permit for the construction of Davis-Besse.

The AEC regulations for the years at issue provided that a construction permit for a nuclear generating facility could not be issued without a public hearing. However, once the construction permit was issued, upon completion of the construction in compliance with the terms and conditions of the permit and subject to any necessary testing of the facility for health or safety purposes, the AEC would, in the absence of good cause shown to the contrary, issue a license to the applicant for the operation of the facility. See 10 C.F.R. §§ 50.56, 50.58 (1970).

In this case, although the construction permit was issued in March 1971, the project was not completed and the operating license was not issued until 1977, more than 6 years later.

During the years at issue, there was opposition to the construction of the Davis-

Besse facility. In October 1970, the Sierra Club and a group called Citizens for Clean Air and Water filed a suit in the United States District Court in Cleveland to block construction of Davis-Besse. The suit asked the court to declare illegal certain 1968 land transfers for the plant site and claimed that the plant would cause serious and irreparable damage to the ecology of a marsh area, rendering it unfit for migratory bird habitation. Although the suit was dismissed by the court in April 1971, 2 weeks later the Sierra Club filed an amended complaint questioning the legality of a 1967 exchange of land with the Department of Interior for use in building the nuclear plant. Also, in April 1971 the Cleveland Coalition for Clean Air and Water and a group from Bowling Green State University filed an appeal with the AEC's Appeal Board against the Reactor Licensing Division's findings and subsequent granting of the construction permit. In May 1971 the Ohio Water Pollution Control Board announced that it would conduct hearings that summer on the certification of Davis-Besse; and, on the following day, the Cleveland Coalition filed petitions in the district court, introducing a motion for the suspension of the construction permit and a review of the AEC's failure to consider nonradiological environmental issues and safety of atomic fuel transportation.

The record does not contain evidence as to the time and manner of disposition of all of these objections to the construction and operation of the nuclear facility. However, although the Davis-Besse nuclear power station was originally scheduled to go into commercial operation in December 1974, it did not receive an operating license nor begin commercial operations until sometime in 1977.

### Discussion

Plaintiff contends that the advertising expenditures are ordinary and necessary business expenses because their purpose was to educate the public about the nature and safety of its operations and to generate goodwill among its customers. The government argues that plaintiff's costs for advertising in connection with the nuclear project were capital expenditures solely on the ground that they were incurred as part of a plan to reduce public opposition to the licensing and construction of a nuclear facility and therefore it should be deemed a part of its cost for the construction permit and operating license, which are capital assets.

■ Expenditures for institutional or "goodwill" advertising, which keep the taxpayer's name before the public are generally deductible as ordinary and necessary business expenses provided the expenditures are related to patronage the taxpayer may reasonably expect in the future. *Poletti v. United States*, 330 F.2d 818, 822 (8th Cir.1964); *Denise Coal Co. v. Commissioner*, 29 T.C. 528, 553 (1957), *aff'd and rev'd on other issues*, 271 F.2d 930 (3rd Cir.1959); *Sanitary Dairy Farms, Inc. v. Commissioner*, 25 T.C. 463, 467 (1955). However, if the advertising serves the predominant purpose of contributing to the acquisition of a capital asset, tangible or intangible, which has value over an extended period beyond the taxable year, the cost of such advertising is not deductible for the taxable year but must be amortized over its expected life period or added to the cost of the asset to which it contributes value. This is a question of fact which must be resolved from all of the evidence and in the light of the burden of proof. *E.H. Sheldon & Co. v. Commissioner*, 214 F.2d 655, 659 (6th Cir.1954); *Rust-Oleum Corp. v. United States*, 280 F.Supp. 796, 799 (N.D.Ill.1967); *see also* Rev.Rul. 68–561, 1968–2 C.B. 117, 119.

Thus, if the advertising expenses were part of the costs of obtaining the construction permit and operating license, then they should be capitalized, just as the training costs associated with Davis-Besse should be capitalized. As in all refund suits, the burden of proof with respect to this issue is on plaintiff. *Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Dysart v. United States*, 169 Ct.Cl. 276, 340 F.2d 624 (1965).

Plaintiff argues that expenditures to inform the public that it is concerned about the safety of its operations is a legitimate part of goodwill advertising and has current value to the company. It is therefore deductible even though it also has future benefits. It also contends that the government has no direct proof that plaintiff's purpose in the advertising was designed to eliminate public opposition to the project in the hearings before the AEC, nor that, even if the public opposition was mollified, plaintiff believed that it would influence the AEC decision. Further, plaintiff contends, the fact that some of the expenditures took place in 1972, after the issuance of the construction permit, indicates that at least those expenditures were not correlated with the issuance of the construction permit.

However, the defendant's position is the more persuasive. First, the problem of allaying the public's fears and apprehensions was not a current one relating to conditions which existed in 1970–72. It was not contemplated that the nuclear facility would go into operation before December 1974 and in fact did not go into operation until 1977. Thus, apart from the administrative proceedings, the hearings, and the other litigation, there was little or no need to spend $147,000 from 1970 to 1972 to inform the public that its fears and apprehensions about the operation of a nuclear plant from 4 to 7 years later were exaggerated or unfounded.

Second, the record shows that there was in fact opposition to the issuance of the permit and license and that even after the issuance of a construction permit, efforts were made both before the AEC and the district court to have it set aside. Whether or not public opinion would have an effect upon the decisions of the AEC and the courts, it was reasonable to believe that the very filing of the oppositions, appeals and lawsuits would cause delays in the approvals of the project which would add to their cost. It is common knowledge that many of the huge overruns in nuclear projects generally throughout the United States have resulted from delays caused by the filings of objections and lawsuits by citizen groups. *See generally* R. Stobaugh & D. Yergin, *Energy Future,* p. 125 (Random House 1979). Thus, it is a fair inference that the advertising and information expenditures designed to allay the fears and apprehensions of the public generally while the nuclear project was under consideration by the regulatory authority and the court had as an important purpose the mitigation of roadblocks and delays in the issuance of the construction permit and operating license.

Third, the construction agreement between plaintiff and Toledo itself indicates that the construction costs to be shared included the payments to a public relations group. The stipulation also indicates, as noted previously, that at least $25,993 was paid to Toledo as reimbursement for expenditures for nuclear advertising expense pursuant to the construction agreement.

Fourth, plaintiff has failed to introduce any evidence that the payments for advertising expense were not correlated with the various administrative proceedings leading to the issuance of the construction permit. The $42,847 in expenditures for 1970 were during the period when the matter was before the AEC and prior to the hearing. Nor has plaintiff offered any evidence to show that the $81,011 spent in 1971 was not spent in the early part of the year prior to the grant of the construction permit in March 1971.

Finally, although it appears to be contended that once the construction permit was issued it was likely that the operating license would follow and there was no need for further expenditures as a cost of obtaining the license, the facts are that there were legal proceedings pending after March 1971 to set aside the construction permit and that the completion of construction and the issuance of the operating license were delayed at least 3 years beyond the date originally contemplated by plaintiff. Plaintiff has not shown that objec-

tions by members of the public were unrelated to such delays.[2]

█ For the foregoing reasons, it is concluded that the advertising expenditures from 1970 through 1972 which had to do with the nuclear project were not ordinary expenses within the contemplation of I.R.C. § 162(a) and hence not deductible during the years at issue. They were capital expenditures, which if deductible at all, must be amortized over the life of the Davis-Besse nuclear power station.

### Eastlake Unit No. 5—Training Expenses

*Statement*

On April 22, 1970, plaintiff entered into an agreement with Duquesne Light Company ("Duquesne") to construct Eastlake Unit No. 5, a coal fired electric generating unit. Under this agreement, CEI and Duquesne were to share the costs of and were to own respectively 68.8 percent and 31.2 percent undivided interests as tenants-in-common in all of the property and facilities of Eastlake No. 5. Each was to be entitled to receive a proportionate share of all electricity produced at the facility. Plaintiff was to be responsible for supervision of both the day-to-day construction and the day-to-day operation of the facility once it was completed. This unit is located on property previously owned in its entirety by CEI, adjacent to CEI's Eastlake units Nos. 1–4 coal-fired plants which have been generating electricity since 1953.

Construction of Eastlake No. 5 began during 1968–69, and was completed in 1972. In late 1971, about one year before Eastlake No. 5 was to begin operations, CEI began to train employees to operate the new facility. The employees selected for training were those already working for CEI at Eastlake Nos. 1–4. They were given both classroom training and on the job observation and instructions.

The training of employees is necessary at every electric generating facility because the potential for injury to personnel and equipment if such equipment is not operated in the proper manner is significant and because the skills required in the operation of an electric generating facility are not readily available in the marketplace. Thus, plaintiff has found it necessary to provide on-the-job training for virtually every new person employed at all of its electric generating facilities.

In addition to the training of new personnel, substantial training of existing personnel occurs at an electric generating plant on an on-going basis. A major segment of this training is necessitated by movement of employees between job classifications. In general, a person performing one particular job cannot perform a different job at an electric generating facility without first receiving training for the new job. Continuing training is also necessary for personnel who do not change job classifications, in the form of refresher courses relating to new techniques or procedures. Generally, when a vacancy occurs, other than at the entry level position of plant helper, the position is filled by an employee from the job classification immediately below the classification wherein the vacancy has occurred.

The operation of Eastlake No. 5 required that certain employees receive training beyond that necessary for the operation of Eastlake Nos. 1–4. The Eastlake No. 5 facility was approximately as large as the original Eastlake Nos. 1–4 combined; and, in addition, the new facility contained devices not found in the other Eastlake plants, such as a pressurized furnace and computers in the control room. As a result, a plant control room operator at Eastlake No. 5 would be a higher grade level than a plant control room operator at Eastlake Nos. 1–4. While Eastlake No. 5 was under construction, these employees were

---

**2.** Even if the advertising expenditures were necessary to restore CEI's current goodwill impaired by the fears and apprehensions caused by the very applications for the permit and license for the nuclear facility, they would be ancillary costs of these intangible assets. *See Hilton Hotels,* 397 U.S. at 583, 90 S.Ct. at 1308 and *Central Texas Savings & Loan Ass'n,* 731 F.2d at 1183.

given training so that they could become thoroughly familiar with the new plant's control room. This training was accomplished through job observations of the equipment being installed, and classroom sessions taught by both the engineers building the plant and by service personnel who were supplying the equipment. CEI also gave similar training to the employees who were to become roving operators at Eastlake No. 5.

Because of its use of existing personnel, plaintiff's total share of the cost of such additional training for Eastlake No. 5 was only $15,545. Plaintiff capitalized these direct training costs on its books and records and for regulatory purposes but then claimed them to be deductible ordinary and necessary expenses for tax purposes. However, the Commissioner disallowed them.

*Discussion*

Defendant does not argue that plaintiff is bound by the manner in which it kept its books for the direct training expenses. Therefore we examine the proper treatment *ab initio*.

█ It is concluded that on balance plaintiff's direct training costs for operation of Eastlake No. 5 constitute ordinary and necessary expenses, for the following reasons:

A. The cost of training employees to operate new equipment in an existing business are generally deductible as ordinary and necessary expenses. *Rankin v. Commissioner*, 17 B.T.A. 1301 (1929); *Knoxville Iron Co. v. Commissioner*, 18 T.C.M. (C.C.H.) 251 (1959).

B. Eastlake No. 5 was constructed and operated by plaintiff itself. Thus, unlike the situation with respect to Davis-Besse, the share of the training costs plaintiff bore without reimbursement from Duquesne may not be deemed an element of a turnkey purchase price for a ready to operate generating facility, including the trained employees. Unless the training costs may be capitalized under some other rationale, the capital asset which plaintiff built was only the plant itself.

C. The direct training expenses were not substantial start-up costs of a new or newly acquired business. The $15,545 total was not a substantial amount. *Cf. Blitzer v. United States*, 231 Ct.Cl. 236, 243, 684 F.2d 874, 880 (1982). Nor was Eastlake No. 5 a new or newly acquired business. It was an additional conventional electrical energy generating unit, adjacent to four others, on land previously owned by plaintiff, larger than the others and incorporating modern features not available when the first four were built but not essentially different in kind. Expansions and acquisitions of additional units of the same kind as those already in use are commonplace facets of the conduct of any existing business, and the training of employees to operate the additions are to be treated as ordinary expenses of the business rather than as start-up costs of a newly acquired business. *First National Bank of South Carolina v. United States*, 558 F.2d 721 (4th Cir.1977); *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (10th Cir.1974); and *cf. Briarcliff Candy Corp. v. Commissioner*, 475 F.2d 775 (2d Cir.1973).

D. The fact that plaintiff could use the existing employees operating Eastlake Nos. 1–4 to operate Eastlake No. 5, with only relatively small amount of additional training expense, indicates that the additional training required by the new unit was not substantially different than that required for new employees generally. Since the latter is deductible, it may not reasonably be concluded that the $15,045 in additional training expense bought plaintiff a new or additional intangible asset.

E. Unlike Davis-Besse, Eastlake No. 5 did not require a new and different license with a prerequisite of a corps of certified personnel. Thus, the training costs of the Eastlake No. 5 personnel may not be deemed a part of the cost of the intangible asset represented by a license.

F. While there was obviously some benefit for future years which could be expected to be derived from the Eastlake No. 5 training, the record does not reflect that immediate benefit was lacking and it is

impractical to make any division of the expenditure for such purpose.

### Eastlake No. 5—Displacement Training Costs

#### Statement

In 1966, prior to the construction of Eastlake No. 5, approximately 170 employees worked in the operation of Eastlake Nos. 1–4 coal-fired electric generating facilities. These employees would be promoted sequentially through the job ranks by serving in a job classification for a period of time and then obtaining training for the next higher level. The training of employees to serve in the next higher level was referred to as "displacement training." Normally, an employee would be promoted when an employee from the next higher job classification would retire, die, be discharged, quit, or receive a promotion. At any given time, approximately 10 percent of Eastlake's personnel would be involved exclusively in obtaining "displacement training."

To operate Eastlake No. 5, CEI required an additional staff of 71 employees at the Eastlake station. These employees were to be transferred to the new facility from Eastlake Nos. 1–4. To compensate for the loss of personnel at the older plants, approximately 7 months to a year prior to the opening of Eastlake No. 5, CEI began to hire additional employees at the lowest job level at Eastlake Nos. 1–4. The new employees were to be trained to replace those being transferred to Eastlake No. 5.

Duquesne was also a member of the Central Area Power Coordination Group ("CAPCO") power pool comprised of plaintiff and four other electric utilities, wherein the nonconstructing utility entitled to a share of the electrical energy agreed to reimburse the constructing utility for displacement training costs in a sum equivalent to $1 per kilowatt hour of installed generating capacity.

No segregation of the actual costs of displacement training was made on the books of CEI because most of the expenses incurred were in the form of employee salaries, which were deducted as such on the books and in its 1972 income tax return. The I.R.S. accepted the CAPCO $1 per kilowatt rate as a reasonable approximation of displacement training costs and required capitalization of $447,200, representing plaintiff's share (68.8 percent) of the plant's installed capacity of 650,000 kw.

#### Discussion

 It is concluded herein that for some of the same reasons for which the direct training expenses are deemed ordinary, the $447,200 were properly deducted by plaintiff as ordinary and necessary expenses.

Like the direct training costs, these expenses were incurred to allow CEI to operate Eastlake No. 5 and not to allow CEI to construct the new generating plant.

The record establishes that plaintiff has a constant turnover of employees at all units, because of retirements, deaths, resignations and promotions. Approximately 10 percent of plaintiff's total labor costs are generally attributable to employee training to replace old employees in vacant higher level jobs and new employees in basic positions, as well as to teach them new techniques and to refresh them on old. Thus, the displacement training here involved was different only in degree and not in kind. Had Duquesne built Eastlake No. 5 and plaintiff's employees resigned their old positions at Nos. 1–4 to take higher paying or more advanced jobs in No. 5, plaintiff would still have had the same displacement training expenses to maintain the operating levels at the preexisting units, and no one would have contested the deduction of the training expenses. There is no persuasive reason to dispute their deduction here.

### Conclusion

1. Plaintiff is not entitled to deductions from income for the years 1970 through 1972 for its expenditures for training of employees attributable to the construction of the Davis-Besse nuclear electric plant.

2. Plaintiff is not entitled to deductions from income for the years 1970 through 1972 for its expenditures for advertising

attributable to the construction of Davis-Besse nuclear energy plant.

3. Plaintiff is entitled to deductions from income for the years 1970 through 1972 for employee training expenses attributable to the placing in operation of the conventional coal-fired electric plant known as Eastlake No. 5.

4. Plaintiff having conceded that it is not entitled to take deductions from income for the years 1970 through 1972 of expenditures for rerouting its power lines and the court having previously decided that plaintiff is not entitled to deductions from income for the years 1970 through 1972 for demolition losses nor for additional investment credits against income taxes for the years 1970 through 1972, the parties are directed to submit to the court a stipulated judgment in accordance with the opinions of the court within 30 days. If they are unable to agree, upon plaintiff's motion, the case will be set for hearing or trial to determine the correct amount of the judgment.